1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone: 619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dainsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   **DINSMORE & SHOHL, LLP**
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)
11

12 Special Counsel to Richard A. Marshack,
   Chapter 11 Trustee
13

14          **UNITED STATES BANKRUPTCY COURT**

15   **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

16

| | |
|---|---|
| In re: | Case No. 8:23-bk-10571-SC |
| THE LITIGATION PRACTICE GROUP P.C., | Chapter 11 |
| Debtor. | Adv. Proc. No. _____ |
| | **COMPLAINT FOR:** |
| RICHARD A. MARSHACK, Chapter 11 Trustee, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| Plaintiff, | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| v. | |
| LEUCADIA ENTERPRISES, INC, | **(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| Defendant. | |
| | **(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR** |

**CONSTRUCTIVE FRAUDULENT TRANSFERS;**

**(5)  AVOIDANCE, RECOVERY AND PRESERVATION OF PREFERENTIAL TRANSFER MADE WITHIN NINETY DAYS OF THE PETITION DATE; AND**

**(6) TURNOVER**

Judge:   Hon. Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Preferential Transfer; and (6) Turnover* ("Complaint"), plaintiff Richard A. Marshack, the Chapter 11 Trustee ("Trustee" or "Plaintiff") for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

2.      Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.      Defendant is notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires defendant to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4.      Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

## THE PARTIES

5.      Plaintiff Richard A. Marshack is the duly appointed, qualified, and acting Chapter 11 Trustee of Debtor's Estate.

6.      Debtor is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.      Defendant Leucadia Enterprises, Inc. ("Defendant") is, and at all material times represented that it was, a limited liability company, existing, and under the laws of the State of California.

8.      Defendant may be served by first class mail postage prepaid upon its registered agent Joyce Yi or Sandra Menjivar at 101 N Brand Blvd., 11th Floor Glendale, California 91203.

## GENERAL ALLEGATIONS

**A.      The Bankruptcy Case**

9.      On March 20, 2023 (the "Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

10.      The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund

1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

11. Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case, and he continues to serve in this capacity at this time. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

12. Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

13. Plaintiff brings this action solely in his capacity as the Chapter 11 Trustee for the benefit of Debtor's Estate and its creditors.

/ / /

**B.    LPG**

14.    LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

15.    The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

16.    The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

17.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

18.    LPG mismanaged the consumers' monthly payments.

19.    To obtain consumer clients to represent, LPG contracted with marketing companies, who engaged in illegal capping.

20.    The marketing companies would advertise to or call to solicit them to become clients of LPG.

21.    The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

22.    In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments made by the consumers.

23.    Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

24.    Many of the documents executed in connection with such financing described the transactions as account receivable purchase agreements.

**C.    Defendant**

25.    Defendant was one of the marketing companies that procured clients for LPG.

26.    LPG agreed to pay, and in fact paid, Defendant a portion of the monthly payments received from consumers referred by Defendant.

27.    Defendant also entered into agreements pursuant to which it purported to purchase accounts receivable from LPG. Pursuant to these agreements, Debtor purported to sell to Defendant a portion of its income stream.

### i.    Affiliate Agreement

28.    Based upon the Trustee's review of the banking transactions between Defendant and Debtor, Debtor entered into an affiliate agreement with Defendant ("Affiliate Agreement"). A true and accurate copy of the summary of the banking transaction history is attached hereto as **Exhibit 1** and incorporated here ("Transaction History").

29.    Based upon the Trustee's review of the Transaction History, the Affiliate Agreement provides Defendant owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG.

30.    Pursuant to the Affiliate Agreement, Defendant generated leads consisting of consumers interested in the legal services offered by LPG and referred those consumers to Debtor.

31.    Defendant went so far as to assist with the execution of an engagement letter with the consumer.

32.    In exchange for the referrals, Debtor paid Defendant on a weekly basis. *See* Transaction History.

33.    The Affiliate Agreement violates Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. CAL. BUS. & PROF. CODE § 6155. "Referral activity" includes "any entity 'which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified' in the advertising." *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 775 (2019). A referral includes receiving information from potential clients and sending

that information to lawyers, even when the advertiser does not advertise the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred. *Id.*

34.     Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

35.     Because the Affiliate Agreements violates federal and state law, it is void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor under the ARPA Agreement was unlawful.

36.     Unlawful consideration is that which is "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any

1    part of a single consideration for one or more objects, or of several considerations for

2    a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

3                    **ii. Account Receivable Purchase Agreements**

4          37.    On or about February 28, 2023, Defendant entered into an Account

5    Receivable Purchase Agreement with Debtor ("ARPA"). A true and accurate copy of

6    ARPA is attached hereto as **<u>Exhibit 2</u>** and incorporated here.

7          38.    ARPA    are    referred    to    collectively    hereinafter    as    the    "ARPA

8    Agreement."

9          39.    Pursuant to the ARPA Agreement, Debtor purported to sell Defendant

10    streams of monthly payments from consumers that were supposed to be held in trust

11    until earned. *See* Ex. 2-5.

12          40.    By entering into the ARPA Agreement, Debtor and Defendant violated

13    federal and state laws by selling unearned legal fees or funds there were supposed to

14    be held in trust or used for the benefit of consumers. *See* Ex. 2-5

15          41.    The effect of the ARPA Agreement was to accomplish an unlawful

16    purpose, the agreement may be declared illegal regardless of the intention of the

17    parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d

18    684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This

19    remains true regardless of whether the contract has been performed. *Stevens v. Boyes*

20    *Hot Springs Co.*, 113 Cal. App. 479 (1931) (A contract by a corporation to purchase

21    its own stock has the effect of illegally withdrawing and paying to a stockholder a

22    part of the capital stock of the corporation and is illegal and void, regardless of the

23    fact that the contract is fully performed by the sellers and partially performed by the

24    corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133 (1952), overruled, *Fomco,*

25    *Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring

26    licenses is to prevent improper persons from engaging in particular activity, or is for

27    purpose of regulating occupation or business for protection of public, imposition of

28    penalty amounts to prohibition against engaging in occupation or business without

license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

42. Because the ARPA Agreement violates federal and state laws, it is void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor under the ARPA Agreement was unlawful.

43. Unlawful consideration is that which is "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

### iii. Preference Letter

44. On or about September 15, 2023, the Trustee sent a preference letter to Defendant (the "Preference Letter"). A true and accurate copy of the Preference Letter is attached hereto as **Exhibit 3** and incorporated here.

45. The Preference Letter discussed certain transfers from Debtor that were made to Defendant within the 90-day period prior to the Petition Date. The transfers were listed on the attached "Preference Transfer Schedule" showing the date and amount, according to Debtor's books and records, of each transfer or other payment. The Trustee requested payment of the total amount due under the "Preference Transfer Schedule" that amounted to $233,818.39, in exchange for a waiver and release from all claims that could be asserted by the Trustee against Defendant pursuant to 11 U.S.C. §§ 547 and 550.

46. The Trustee has yet to receive any payment from Defendant pursuant to the "Preference Transfer Schedule."

/ / /

/ / /

### D.    Payments to Defendant

47.    During the applicable reach back-period, Debtor paid Defendant the sum of at least $1,468,018.19 ("Transfers"). *See* Ex. 1.

### E.    LPG's Prepetition Creditors

48.    Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

49.    When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[1]

50.    As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing it with consumer clients. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from

---

[1] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

whatever future income the Debtor would receive.

51.     In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

52.     Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, the

1  "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and

2  Priority Unsecured Creditors, the "Prepetition Creditors").

3  **FIRST CLAIM FOR RELIEF**

4  **Count I - Avoidance, Recovery, and Preservation of Actual Fraudulent**

5  **Transfers**

6  **[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

7  53.    Plaintiff realleges and incorporates here by reference each and every

8  allegation contained in paragraphs 1 through 52 as though set forth in full.

9  54.    The Transfers happened while Debtor was insolvent or rendered Debtor

10  insolvent.

11  55.    Despite Debtor's obligation to the Prepetition Creditors, Debtor

12  continued to pay Defendant sums received from consumers under the Affiliate

13  Agreement, which constitutes an illegal capping agreement between Defendant and

14  Debtor, in order to continue to receive additional consumer referrals. Any obligation

15  of the Debtor arising from such agreement is also avoidable as fraudulent.

16  56.    Despite Debtor's obligation to the Prepetition Creditors, Debtor

17  continued to sell or transfer portions of its accounts receivable to Defendant, which

18  is illegal under federal and state laws.

19  57.    Because the referrals from Defendant to Debtor are illegal under federal

20  and state law, they are void. Moreover, any purported consideration and constitutes

21  unlawful consideration, which cannot constitute reasonably equivalent value. Thus,

22  at the time the agreements were executed and the Transfers, Debtor received less

23  than reasonably equivalent value.

24  58.    The Affiliate Agreement, ARPA Agreement, and the Transfers of

25  Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A),

26  550, and 551 by one or more creditors who held and hold unsecured claims against

27  Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that

28  were not and are not allowable only under 11 U.S.C. § 502(e), including, without

1    limitation, the Prepetition Creditors.

2        59.    The Affiliate Agreement, ARPA Agreement, and Transfers should be

3    avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such transferred property,

4    or the value thereof, should be recovered and preserved for the benefit of the Estate

5    pursuant to 11 U.S.C. §§ 550 and 551.

6    **<u>SECOND CLAIM FOR RELIEF</u>**

7    **Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers**

8    **Against Defendant**

9    **[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

10        60.    Plaintiff realleges and incorporates here by reference each and every

11    allegation contained in paragraphs 1 through 52 as though set forth in full.

12        61.    The Affiliate Agreement, ARPA Agreement, and all or a portion of the

13    Transfers occurred within the two years prior to the Petition Date.

14        62.    On or after the date that such agreements were executed and such

15    Transfers were made, entities to which Debtor was or became indebted include the

16    Prepetition Creditors.

17        63.    The Transfers happened while Debtor:

18            a.  was insolvent or became insolvent was a result;

19            b.  was engaged or was about to engage in a transaction for which any

20               property remaining with Debtor was of unreasonably small capital;

21               or

22            c.  intended to incur, or believed that it would incur, debts beyond it

23               ability to pay as such debts matured.

24        64.    Because the referrals from Defendant to Debtor are illegal under

25    federal and state law, they are void and subject to avoidance as fraudulent. Any

26    purported consideration constitutes unlawful consideration, which cannot constitute

27    reasonably equivalent value. Thus, at the time the agreements were executed and the

28    Transfers made, Debtor received less than reasonably equivalent value.

65.     Because the sale of the accounts receivable from Debtor to Defendant are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time agreements were executed and the Transfers, Debtor received less than reasonably equivalent.

66.     The Affiliate Agreement, ARPA Agreement, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

### THIRD CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers**

**Against Defendant**

**[11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.04(a) and 3439.07]**

67.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 52 as though set forth in full.

68.     The Affiliate Agreement, ARPA Agreement, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

69.     On or after the date that such agreements were entered and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

70.     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Defendant sums received from consumers under the Affiliate Agreement, which constitutes an illegal capping agreement between Defendant and Debtor.

71.     Because the referrals from Defendant to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers

1    made, Debtor received less than reasonably equivalent value.

2        72.    Despite Debtor's obligation to the Prepetition Creditors, Debtor

3    continued to sell its accounts receivable to Defendant, which is illegal under federal

4    and state law. Because they are illegal under federal and state law, they are void and

5    subject to avoidance as fraudulent. Any purported consideration constitutes unlawful

6    consideration, which cannot constitute reasonably equivalent value. Thus, at the time

7    the agreements were executed and the Transfers made, Debtor received less than

8    reasonably equivalent value.

9        73.    The Affiliate Agreement, the ARPA Agreement, and the Transfers of

10    Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and CAL.

11    CIV. CODE §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold

12    unsecured claims against Debtor that were and are allowable against his Estate under

13    11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e),

14    including, without limitation, the Prepetition Creditors.

15        74.    Accordingly, the Affiliate Agreement, the ARPA Agreement, and the

16    Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and CAL. CIV.

17    CODE §§ 3439.04(a) and 3439.07, and such property, or the value thereof, should be

18    recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550

19    and 551 and CAL. CIV. CODE § 3439.07.

20

21                    **FOURTH CLAIM FOR RELIEF**

22    **Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers**

23                            **Against Defendant**

24    **[11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.05, and 3439.07]**

25        75.    Plaintiff realleges and incorporates herein by reference each and every

26    allegation contained in paragraphs 1 through 52 as though set forth in full.

27        76.    The Affiliate Agreement, the ARPA Agreement, and all or a portion of

28    the Transfers occurred within the four years prior to the Petition Date.

77.    The Transfers happened while Debtor:

    d.  was insolvent or became insolvent as a result;

    e.  was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    f.  intended to incur, or believed that it would incur, debts beyond it ability to pay as such debts matured.

78.    Because the referrals from Defendant to Debtor are illegal under federal and state law, the agreements are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

79.    Because the sale of the accounts receivable from Debtor to Defendant are illegal under federal and state law, they are void and constitute unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value

80.    The Transfers of Debtor's trust funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and CAL. CIV. CODE §§ 3439.05 and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

81.    Accordingly, the Affiliate Agreement, the ARPA Agreement, and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and CAL. CIV. CODE §§ 3439.05 and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C.

§§ 550 and 551 and CAL. CIV. CODE § 3439.07.

**FIFTH CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of Preferential Transfer to Defendant in Preference Period**

**[11 U.S.C. §§ 547, 550, and 551]**

82.    The Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 52 as though set forth in full.

83.    $76,961.27 of the Transfers from Debtor to Defendant occurred during the 90 day preference period ("Preference Transfers"). *See* **Exhibit 4** and incorporated here.

84.    The Preference Transfers was made for, or on account of, an antecedent debt or debts owed by the LPG to Defendant, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of Defendant.

85.    The Preference Transfers happened while LPG was insolvent.

86.    Debtor is also entitled to the presumption of insolvency when the Preference Transfers happened pursuant to 11 U.S.C. § 547(f).

87.    As a result of the Preference Transfers, Defendant recovered more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the Preference Transfers had not been made; and (iii) Defendant received payments of its debts under the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's bankruptcy estate.

88.    In accordance with the foregoing, the Preference Transfers of the Statement is avoidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

/ / /

## SIXTH CLAIM FOR RELIEF

### Turnover of Estate Property Against Defendant

### [11 U.S.C. § 542]

89.　　Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 52 as though set forth in full.

90.　　Defendant has possession or control over property of the Estate in the form of the Transfers made pursuant to illegal and unenforceable agreements.

91.　　The Transfers are not of inconsequential value to the Estate.

92.　　The funds that are the subject of the Transfers are paramount to Debtor's ability to pay creditors.

93.　　Accordingly, Trustee is entitled to a judgment for turnover of the Transfer pursuant to 11 U.S.C. § 542.

## RESERVATION OF RIGHTS

94.　　Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendant, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First, Second, Third, and Fourth Claims for Relief:**

1.　　Avoiding, recovering, and preserving the Transfers against Defendant;

**On the Fifth Claim for Relief:**

2.　　Avoiding, recovering, and preserving the Transfers against Defendant;

**On the Sixth Claim for Relief:**

3.　　 Ordering Defendant to immediately turn over the Transfers;

**On All Claims for Relief:**

4.    Awarding costs of suit incurred herein; and

5.    Granting any other and further relief as the Court deems just and proper.

Dated: January 9, 2024             Respectfully submitted,

DINSMORE & SHOHL LLP

By: /s/ Sarah S. Mattingly
    Christopher B. Ghio
    Christopher Celention
    Yosina M. Lissebeck
    Sarah S. Mattingly (pro hac vice)
    Special Counsel to Richard A. Marshack, Chapter 11 Trustee

**EXHIBIT "1"**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1
Page 20

In re: The Litigation Practice Group PC
Disbursement Details by Payee
Leucadia Enterprises, Inc.
4 Years Pre-Petition (03/20/2019 - 03/20/2023)



| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Wells Fargo | Maverick Management Group LLC | | 3/31/2023 | 3/17/2023 | | 875.43 | WT Fed#08821 Bank of America, N /Flr/Bnl=Leucadia Enterprises Inc. I# 0000960076856725 Trn#23031 7183048 Rlb# |
| UnionBank | The Litigation Practice Group PC | | 2/28/2023 | 2/27/2023 | | 21,506.07 | WIRE TRANS TRN 0227020620 022723 UBOC UB278478N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises Inc. |
| Chase | The Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | | 18,287.64 | Fedwire Debit Via: F121000358/121000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/17:47 Imad: 0207B1Qgc07C031922 Trn: 6647500038Jo |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/24/2023 | | 14,511.81 | Fedwire Debit Via: F121000358/121000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/Time)15:47 Imed: 012461 Ogc08C032056 Tm: 5652200024Jo |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/6/2023 | | 17,136.20 | Fedwire Debit Via' Ft2t000356/121000358 NC: Leucedie Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/Time/14:47 Imat: 0106B1Qgc06C029339 Tm: 47I6200006Jo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 2,558.44 | Fedwire Debit Vie: F121000358/121000358 NC: Leuoedie Enterprises, Inc. Enoinitas, CA, 92024 US Ret: Weekly Disbursement/Time/14:39 Imad: 123D8 1 OgoD8CD67773 Tm: 5574600364Jo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/28/2022 | | 20,373.32 | Fedwire Debit Via: F121000358/121000358 NC: Leucedie Enterprises, Inc. Enoinitas, CA, 92024 US Ret: Weekly Disbursement/Time/17:D1 Imad: 1 228B1 Qgc06C02281 7 Tm: 740570036J0 |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/19/2022 | | 13,938.06 | Fedwire Debit Via: Ft21000358/121000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 us Ret Weekly Disbursement/Time/1T25 Imad 121 9Bi 0gc08C042838 Tm: 8059200353Jo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/12/2022 | | 12,206.24 | Fadwira Debit Via: F121000358/121000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/Time/17:04 Imed: 121 2B1 Qgc08CO5l 243 Tm: 7780600346Jo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/5/2022 | | 20,978.80 | Fedwire Debit Via: F121000356/121000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/Time/15:00 Imad: 120581 OgoOl C006405 Tm: 5591 200339Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/25/2022 | | 17,032.06 | Fedwire Debit Via: Fl2i000356/12i000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/i7:53 Imad: I 125B1Qgc07C02936l Tm: 4275300329Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/25/2022 | | 12,379.19 | Fadwira Debit Via: Fl 21000356/121000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/i7:53 Imad: 1 125B1Qgc08C024734 Tm: 4225400329Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/10/2022 | | 16,665.67 | Fedwire Debit Via: F121000358/121000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/17 26 Imad 11 10B1Qgc08C048493 Tm: 805720031 4Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/9/2022 | | 20,662.71 | Fedwire Debit Via: F121000358/121000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/12:39 Imad: 1 109B1Ogc08C023525 Tm: 421300031 3Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/28/2022 | | 1,160.22 | Fedwire Debit Via: F121000358/121000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/i 6:57 Imad: 1 028B1 QgcO6COi 9256 Tm: 7394800301 Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/21/2022 | | 13,332.98 | Fedwire Debit Via: Fi2i000358/i2i000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 us Ret: Weekly Disbursement/i 4:23 Imad: 1021 BlQgc08CO2484i Tm: 505i000294Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/14/2022 | | 19,707.16 | Fedwire Debit Via: Fl 21000358/121000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/i 3:06 Imad: lOl4BlQgcO8COi i32i Tm: 6293900287Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/6/2022 | | 15,602.43 | Fedwire Debit Via: F121000358/121000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 us Ref: Weekly Disbursement/Time/i 2:30 Imad: 1006B1QgcO1COO6O2 Tm: 4308100279Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/3/2022 | | 22,956.41 | Fedwire Debit Via: F121000358/121000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/i 7:25 Imad: 1 003B1 QgcO3CO2i 584 Tm: 8036900276Jo |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/23/2022 | | 7,768.53 | Fedwire Debit Via: Fi2i000358/i2i000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 1:02 Imad: O923BlQgcO8COi 1081 Tm: 3i0220266Jo |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/19/2022 | | 23,910.97 | Fedwire Debit Via: Fl 21000358/121000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/i 1:51 Imad: 091 9B1 Qgc02C005589 Tm: 3594900262Jo |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/9/2022 | | 11,779.42 | Fedwire Debit Via: F121000358/121000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 us Ref: Weekly Disbursement/Time/i 1:57 Imad: 0909B1 Qgc08C006394 Tm: 3434200252Jo |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/2/2022 | | 18,445.96 | Fedwire Debit Via: Fi2i000358/2i000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i i :50 Imad: 0902B1 QgcO4COOO7i ii Tm: 3738700245Jo |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/26/2022 | | 18,783.57 | Fedwire Debit Via: Fi2i000358/i2i000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 3:43 Imad: 0826B1 Qgc04C009842 Tm: 4482900238Jo |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/19/2022 | | 17,982.46 | Fedwire Debit Via: Fl 21000358/121000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/i 0:44 Imad: 081 9B1 Qgc08COi 0921 Tm: 2833500231 Jo |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/11/2022 | | 17,339.40 | Fedwire Debit Via: F121000358/121000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 1:28 Imad: 0811 Bi Qgc02C005903 Tm: 3895500223Jo |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/5/2022 | | 20,096.72 | Fedwire Debit Via: F121000358/121000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 1:27 Imad: 0805B1Qgc07C007562 Tm: 3099300217Jo |
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/29/2022 | | 22,045.35 | Fedwire Debit Via: Fi2i000358/i2i000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/Time/i 1:24 Imad: 0729B1Qgc04C0i2006 Tm: 3705800zi0Ju |

DRAFT FORM - SUBJECT TO CHANGE

EXHIBIT 1
Page 21

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)



| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/21/2022 | | 10,126.83 | Fedwire Debit Via: Fi2i000358/i2i000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 3:55 Imad: 0721 Bi Qgc04C006660 Tm: 5237300202Jo |
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/14/2022 | | 24,876.39 | Fedwire Debit Via: F121000358/121000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 2:54 Imad: 0714B1Qgc02C005789 Tm: 5105800195Jo |
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/8/2022 | | 14,468.44 | Fedwire Debit Via: Fi2i000358112i000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/Time/i 2:47 Imad: O7O8BlQgcO7COi 1535 Tm: 4045300i89Jo |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/30/2022 | | 26,055.01 | Fedwire Debit Via: F121000358/121000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 us Ref: Weekly Disbursement/Time/i 3:37 Imad: 0630B1 Qgc03C022277 Tm: 5590000181 Jo |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/23/2022 | | 12,675.49 | Fedwire Debit Via: F121000358/121000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 15:31 Imad: 0623B1 Qgc2C006451 Tm: 650920001 74Jo |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/16/2022 | | 23,549.54 | Fedwire Debit Via: F121000358/121000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 1:59 Imad: 061 6B1 Qgc02C004577 Tm: 3746800I67Jo |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/10/2022 | | 15,013.69 | Fedwire Debit Via: Fi2i000358/i2i000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 U5 Ret: Weekly Disbursement/Time/i 4:45 Imad: 0610B1Qgc03C005552 Tm: 5i4iiOOi6iJo |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/3/2022 | | 18,705.49 | Fedwire Debit Via: F121000358/121000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 7:20 Imad: 0603Bi Qgc080029998 Tm: 620330001 54Jo |
| Chase | The Litigation Practice Group PC | | 5/31/2022 | 5/27/2022 | | 18,652.86 | Fedwire Debit Via: Fi2i000358/i2i000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 6:48 Imad: 0527B1 QgcO7COi 9593 Tm: 7i57600i47Jo |
| Chase | The Litigation Practice Group PC | | 5/31/2022 | 5/19/2022 | | 22,193.31 | Fedwire Debit Via: FI 21000358/i 21000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/Time/i 4:24 Imad: 0519B1Qgc06C0ii0923 Tm: 5545000i39Jo |
| Chase | The Litigation Practice Group PC | | 5/31/2022 | 5/13/2022 | | 24,250.18 | Fedwire Debit Via: Fi2i000358/12i000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 5:50 Imad: 051 3B1 Qgc08C02974i Tm: 74419001 33Jo |
| Chase | The Litigation Practice Group PC | | 5/31/2022 | 5/5/2022 | | 16,159.03 | Fedwire Debit Via: F121000358/121000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 6:59 Imad: 0505B1 Qgc03C0i2285 Tm: 7i20700i25Jo |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/28/2022 | | 28,740.27 | Fedwire Debit Via: Fi2i000358/i2i000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly DisbursementITime/13:54 Imad: 0428B1Qgc08C026922 Tm: 5926600118Jo |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/21/2022 | | 13,481.39 | Fedwire Debit Via: Fi2i000358/i2i000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 us Ref: Weekly Disbursement/Time/i 3:13 Imad: 0421 BlQgcO7COiO99l Tm: 487850011 iJ0 |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/18/2022 | | 23,830.88 | Fedwire Debit Via: Fi2i000358/i2i000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/Time/12:50 Imad: 041 8B1 QgcO6COi 1681 Tm: 4353900i08Jo |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/7/2022 | | 26,023.52 | Fedwire Debit Via: Fi21000358/121000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 us Ref: Weekly Disbursement/Time/i 4:50 Imad: O4O7BlQgcO7COi 1433 Tm: 5689200097Jo |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/1/2022 | | 18,189.23 | Fedwire Debit Via: Fi2i000358/i2i000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 3:48 Imad: 0401B1Qgc05C013460 Tm: 50i670009iJo |
| Chase | The Litigation Practice Group PC | | 3/31/2022 | 3/24/2022 | | 20,502.42 | Fedwire Debit Via: Fi2i000358/i2i000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 5:08 Imad: 0324B1 Qgc04C009058 Tm: 5974200083Jo |
| Chase | The Litigation Practice Group PC | | 3/31/2022 | 3/18/2022 | | 20,727.33 | Fedwire Debit Via: F121000358/121000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly DisbursementITime/13:22 Imad: 031 8B1 Qgc03C009750 Tm: 4568600077Jo |
| Chase | The Litigation Practice Group PC | | 3/31/2022 | 3/10/2022 | | 25,042.67 | Fedwire Debit Via: Fi2i000358/i2i000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 6:56 Imad: O3lOBlQgcOlCOii682 Tm: 74i2900069Jo |
| Chase | The Litigation Practice Group PC | | 3/31/2022 | 3/4/2022 | | 18,487.62 | Fedwire Debit Via: F121000358/121000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 5:50 Imad: 0304B1 QgcO3COO9l 89 Tm: 5363800063Jo |
| Chase | The Litigation Practice Group PC | | 2/28/2022 | 2/25/2022 | | 40,102.23 | Fedwire Debit Via: Fi2i000358/i2i000358 A/C: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 5:26 Imad: 0225B1 QgcO6COi 6825 Tm: 6364900056Jo |
| Chase | The Litigation Practice Group PC | | 2/28/2022 | 2/22/2022 | | 21,074.35 | Fedwire Debit Via: Fi2i000358/121000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ref: Weekly Disbursement/Time/i 7:52 Imad: 0222B1Qgc01C018482 Tm: 7923200053Jo |
| UnionBank | The Litigation Practice Group PC | | 2/28/2022 | 2/11/2022 | | 12,316.38 | WIRE TRANS TRN 0211017125 021122 UBOC UB102897N Sent To: Leucadia Enterprises, Inc. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 2/28/2022 | 2/4/2022 | | 20,587.30 | WIRE TRANS TRN 0204022678 020422 UBOC UB131172N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 1/31/2022 | 1/28/2022 | | 18,837.43 | WIRE TRANS TRN 0128019456 012822 UBOC UB169965N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 1/31/2022 | 1/21/2022 | | 20,581.84 | WIRE TRANS TRN 0121016155 012122 UBOC UB210903N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 1/31/2022 | 1/13/2022 | | 14,149.72 | WIRE TRANS TRN 0113021475 011322 UBOC UB246540N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |

DRAFT FORM - SUBJECT TO CHANGE

EXHIBIT 1

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

**GROBSTEIN TEEPLE**

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| UnionBank | The Litigation Practice Group PC | | 1/31/2022 | 1/10/2022 | | 18,091.18 | WIRE TRANS TRN 0110021675 011022 UBOC UB269046N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 12/31/2021 | 12/31/2021 | | 23,507.98 | WIRE TRANS TRN 1231023081 123121 UBOC UB305832N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 12/31/2021 | 12/23/2021 | | 11,339.60 | WIRE TRANS TRN 1223024587 122321 UBOC UB341250N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 12/31/2021 | 12/17/2021 | | 28,381.81 | WIRE TRANS TAN 1217017553 121721 UBOC UB382887N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 12/31/2021 | 12/9/2021 | | 18,871.59 | WIRE TRANS TRN 1209021671 120921 UBOC UB426444N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| Optimum Bank | Coast Processing LLC dba LPG | | 12/31/2021 | 12/2/2021 | | 22,052.86 | WIRE TO Leucadia Enterprisoe, Inc |
| Optimum Bank | Coast Processing LLC dba LPG | | 11/30/2021 | 11/26/2021 | | 21,400.82 | WIRE TO Leucadia Enterprises, Inc |
| Optimum Bank | Coast Processing LLC dba LPG | | 11/30/2021 | 11/18/2021 | | 20,153.63 | WIRE TO Leucadia Enterprises, Inc |
| Optimum Bank | Coast Processing LLC dba LPG | | 11/30/2021 | 11/12/2021 | | 14,810.80 | WIRE TO Leucadia Enterprises, Inc |
| Optimum Bank | Coast Processing LLC dba LPG | | 11/30/2021 | 11/5/2021 | | 22,385.90 | WIRE TO Leucadia Enterprises, Inc |
| Optimum Bank | Coast Processing LLC dba LPG | | 10/29/2021 | 10/26/2021 | | 15,866.79 | WIRE TO Leucadia Enterprises, Inc |
| Optimum Bank | Coast Processing LLC dba LPG | | 10/29/2021 | 10/14/2021 | | 23,411.86 | WIRE TO Leucadia Enterprises, Inc |
| Optimum Bank | Coast Processing LLC dba LPG | | 10/29/2021 | 10/7/2021 | | 19,912.16 | WIRE TO Leucadia Enterprises, Inc |
| Optimum Bank | Coast Processing LLC dba LPG | | 10/29/2021 | 10/1/2021 | | 28,575.37 | WIRE TO Leucadia Enterprises, Inc |
| UnionBank | The Litigation Practice Group PC | | 9/30/2021 | 9/22/2021 | | 12,451.84 | WIRE TRANS TRN 0922021200 092221 UBOC UB842661N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 9/30/2021 | 9/16/2021 | | 33,077.45 | WIRE TRANS TRN 0916025624 091621 UBOC UB868467N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 9/30/2021 | 9/9/2021 | | 14,457.87 | WIRE TRANS TRN 0909021769 090921 UBOC UB909003N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 9/30/2021 | 9/1/2021 | | 17,684.39 | WIRE TRANS TRN 0901027869 090121 UBOC UB944337N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 8/31/2021 | 8/25/2021 | | 22,776.41 | WIRE TRANS TRN 0825024050 082521 UBOC UB987501 N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 8/31/2021 | 8/20/2021 | | 497.28 | WIRE TRANS TRN 0820021982 082021 UBOC UB009981 N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 8/31/2021 | 8/20/2021 | | 17,662.38 | WIRE TRANS TRN 0820019215 082021 UBOC UB012060N Sent To: BANK OF AMERICA NA. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 8/31/2021 | 8/11/2021 | | 9,226.57 | WIRE TRANS TRN 0811021537 081121 UBOC UB059940N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 8/31/2021 | 8/4/2021 | | 14,528.48 | WIRE TRANS TRN 0804022023 080421 UBOC UB094584N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| UnionBank | The Litigation Practice Group PC | | 7/31/2021 | 7/28/2021 | | 27,469.83 | WIRE TRANS TRN 0728027712 072821 UBOC930 UB1 32507N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises, Inc. |
| | | | | | | **1,468,018.91** | |

DRAFT FORM - SUBJECT TO CHANGE

EXHIBIT 1

**EXHIBIT "2"**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 2
Page 24

DocuSign Envelope ID: 514FA708-E7CA-4A39-A491-244E2563F052

### ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of February 28, 2023 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), and Leucadia Enterprises, Inc (the "**Seller" or "LPG**", and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $5,106.22 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if in any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file package as

EXHIBIT 2
Page 25

a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

**ARTICLE 4.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

DocuSign Envelope ID: 51AFA708-E7CA-4A39-A401-244F2563F052

Section 4.3    No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

# ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

# ARTICLE 6.
## CLOSING

Section 6.1    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission.  A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 514FA708-E7CA-4A29-A401-244F2F63F052

Section 7.4    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _____
         *Daniel S March*
Name: Daniel S March
Title: Managing Shareholder

**SELLER:**

**Leucadia Enterprises, Inc**

By: _____
Name: Jason Malik
Title: Member

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

    The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____
         *Daniel S March*
Name: Daniel S. March
Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

EXHIBIT 2
Page 32

DocuSign Envelope ID: 514FA708-E7CA-4A79-A401-244F2563F052

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)     "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)     "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)     "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)     "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)     "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)     "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)     "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)     "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)     "**Closing**" shall have the meaning set forth in Section 6.1.

(j)     "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)     "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)     "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)     "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)     "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

EXHIBIT 2
Page 33

DocuSign Envelope ID: 514FA708-E7CA-4A39-A404-244E2563F052

(o)     "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)     "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)     "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)     "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)     "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)     "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)     "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)     "**Losses**" shall have the meaning set forth in Section 6.4.

(w)     "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)     "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)     "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)     "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)     "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT 2
Page 34

DocuSign Envelope ID: 51AFA708-E7CA-4A39-A491-244F2563F052

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

EXHIBIT 2
Page 35

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Defined Terms.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      Sale of Purchased Accounts; Assignment.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      Further Assurances.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      Terms of the Purchase Agreement.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _____
    Name: Daniel S. March
    Title: Managing Shareholder

**SELLER:**

**Leucadia Enterprises, Inc**

By: _____
    Name: Jason Malik
    Title: Member

VOID

Accounts Receivable Purchase Agreement

EXHIBIT 2
Page 37

**Schedule 2.3**
**Wire Instructions**

<u>**$5,106.22**</u>

**Account Holder Name: Leucadia Enterprises, Inc**

**Address: 126 Hermes Ave Encinitas, CA 92024**

**Routing Number:** ▮▮▮▮▮▮

**Account Number:** ▮▮▮▮▮▮▮



# EXHIBIT "3"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 3
Page 39



*Legal  Counsel.*

**DINSMORE & SHOHL** LLP
100 West Main Street, Suite 900
Lexington, Kentucky 40507
www.dinsmore.com

Tyler Powell
(859) 425-1046 (direct) ^ (859) 425-1099 (fax)
Tyler.powell@dinsmore.com

September 15, 2023

**CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FEDERAL RULE OF EVIDENCE 408**

Leucadia Enterprises, Inc.
DBA First Step Debt Resolution
jmalik@firststepdebtresolution.com

      Re:    In re: The Litigation Practice Group, P.C.
           U.S. Bankruptcy Court, Central District of California, Case No. 8:23-bk-10571

Dear Sir/Madam:

      This firm represents Richard A. Marshack, solely in his capacity as Chapter 11 Trustee ("Trustee") for the bankruptcy estate of The Litigation Practice Group, P.C. ("Debtor") in the above-referenced bankruptcy case. Pursuant to 11 U.S.C. § 1107 and his appointment as Trustee, the Trustee has the obligation to investigate and pursue claims, including avoidance actions.

      After a review of the Debtor's books and records, the Trustee believes that he may have claims against you to avoid and recover certain payments. This letter is written in an attempt to settle such claims, and its contents may not be used for any other purpose.

      Section 547 of the Bankruptcy Code permits a trustee or debtor-in-possession to avoid certain payments made to creditors within the 90-day period preceding the filing of a bankruptcy case. We have completed our preliminary investigation and have identified certain transfers from the Debtor(s) to you within the 90-day period prior to March 20, 2023, the date upon which the Debtor filed its bankruptcy case. These transfers are listed on the attached "Preference Transfer Schedule" showing the date and amount, according to the Debtor's books and records, of each transfer or other payment. The payments referenced on the "Preference Transfer Schedule" total $ 76,961.27. It appears that these transfers are preferential transfers which can be avoided by the Trustee and recovered from you pursuant to 11 U.S.C. §§ 547(b) and 550(a). This means that the Trustee can file suit in the bankruptcy court to recover these sums and object to payment of any claims you have against the Debtor until the suit is resolved.

      Additionally, if you have filed a proof of claim against the Debtor, that claim may be disallowed pursuant to Section 502(d) of the Bankruptcy Code for failure to return an avoidable transfer. This means that if the preference claims against you are not resolved, then you may not

EXHIBIT 3
Page 40

receive a distribution from the Debtor's bankruptcy estate. The Trustee reserves the right to object to any proof of claim that you have filed or may file in the debtors' bankruptcy cases.



In the alternative, if you believe a valid defense to recovery exists for some or all of the transfers from the Debtor, please bring such defenses to our attention and we will assess any evidence you provide in support of a defense. We have made efforts to analyze your reasonably known affirmative defenses to the avoidance of the preference payments. Based on our currently available information and given the nature of your relationship with the Debtor, we do not believe there are any potential defenses to reduce your liability for the preference payments. There may be information or facts that we do not have to assess your potential defenses. If you intend to assert a defense, please provide all documents evidencing any alleged defenses under 11 U.S.C. § 547(c), including, but not limited to, contracts, invoices and any other documentation showing the date, terms and amounts for the transfers received and any documents evidencing shipment dates as to goods and services provided by you to the Debtors. To properly assert a defense, such information must show the date of receipt of the Debtors' payment and the amount, deposit date, and any proof of deposit for any or all of the transfers. In addition, if you assert an ordinary course of business defense, please provide the previous information for the one year period immediately preceding March of 2023, or for the period that you actually did business with the Debtor, if less than one year. Please make arrangements to provide any evidence in support of a defense to us as soon as possible.

If we have not received any reply to this letter by September 28, 2023, we will proceed to pursue recovery of the preferential transfers by filing suit against you in the bankruptcy court. The Trustee also reserves all rights to bring additional claims against you as the investigation into your relationship with the Debtor continues and/or after discovery begins once a suit is filed.

Of course, we would be happy to discuss this matter with you or your counsel.

Very truly yours,

DINSMORE & SHOHL LLP

Tyler Powell, Partner of Counsel

2

EXHIBIT 3
Page 43

**The payment proposal set forth above is understood, acknowledged and voluntarily agreed to.  In exchange for a waiver and release from all claims that could be asserted by the Trustee of The Litigation Practice Group, P.C. pursuant to 11 U.S.C. §§ 547 and 550, I am authorized to accept this proposal on behalf of Point Break Holdings, LLC.  The sum of $_____ is enclosed.  I understand I may amend my claim to include the amount paid as part of my unsecured claim**.


_____


**BY**: _____

**TITLE**: _____

**DATE**: _____

*Enclosure*

3

EXHIBIT 3
Page 42

### The Litigation Practice Group, P.C. Preference Transfer Schedule

| Vendor Name | Payment Date | Payment Amount |
|---|---|---|
| Leucadia Enterprises, Inc. | 3/17/2023 | $875.43 |
| Leucadia Enterprises, Inc. | 2/27/2023 | $21,506.07 |
| Leucadia Enterprises, Inc. | 1/24/2023 | $14,511.81 |
| Leucadia Enterprises, Inc. | 1/6/2023 | $17,136.20 |
| Leucadia Enterprises, Inc. | 12/30/2022 | $2,558.44 |
| Leucadia Enterprises, Inc. | 12/28/2022 | $20,373.32 |
| | | **Total: $ 76,961.27** |

EXHIBIT 3
Page 43

# EXHIBIT "4"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 4
Page 44

In re: The Litigation Practice Group PC
Disbursement Details by Payee
90 Days Pre-Petition (12/20/2022 - 03/20/2023)



| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Wells Fargo | Maverick Management Group LLC | | 3/31/2023 | 3/17/2023 | | 875.43 | WT Fed#08821 Bank of America, N /Flr/Bnl=Leucadia Enterprises Inc. I# 0000960076856725 Trn#23031 7183048 Rlb# |
| UnionBank | The Litigation Practice Group PC | | 2/28/2023 | 2/27/2023 | | 21,506.07 | WIRE TRANS TRN 0227020620 022723 UBOC UB278478N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Leucadia Enterprises Inc. |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/24/2023 | | 14,511.81 | Fedwire Debit Via: F121000358)121000358 NC: Leucadia Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement)Time)15:47 Imed: 012461 Ogc08C032056 Tm: 5652200024Jo |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/6/2023 | | 17,136.20 | Fedwire Debit Via' Ft2t000356/121000358 NC: Leucedie Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/Time/14:47 Imad: 0106B1Ogc06C029339 Tm: 47I6200006Jo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 2,558.44 | Fedwire Debit Vie: F1210003S6/121000358 NC: Leuoedie Enterprises, Inc. Encinitas, CA, 92024 US Ret: Weekly Disbursement/Time/14:39 Imad: 123DB 1 OgoD8CD67773 Tm: 5574600364Jo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/28/2022 | | 20,373.32 | Fedwire Debit Vie: F121000358/121000358 NC: Leucadia Enterprises, Inc. Enoinitas, CA, 92024 US Ret: Weekly Disbursement/Time/17:D1 Imad: 1 228B1 QgcD6C02281 7 Tm: 7405700362J0 |
| | | | | | | 76,961.27 | |